01

02

03

04

05

06                           UNITED STATES DISTRICT COURT
                            WESTERN DISTRICT OF WASHINGTON
07                                     AT SEATTLE

08  ERIC JONES,                            )
                                           )   CASE NO. C09-1183-JCC
09          Petitioner,                    )
                                           )
10      v.                                 )   REPORT AND RECOMMENDATION
                                           )
11  PATRICK GLEBE,                         )
                                           )
12          Respondent.                    )
    _____ )

13

14          Petitioner Eric Jones proceeds pro se in this 28 U.S.C. § 2254 habeas action.   He is in

15  custody pursuant a 2005 conviction for first-degree assault while armed with a deadly weapon

16  (domestic violence), felony harassment while armed with a deadly weapon (domestic

17  violence), and unlawful imprisonment (domestic violence).   (Dkt. 14, Ex. 1.)   The superior

18  court sentenced petitioner to 180 months of incarceration.   (Id. at 4.)

19          Petitioner initially raised three grounds for relief.   (Dkt. 6.)   Respondent filed an

20  answer to the petition with relevant portions of the state court record.   (Dkts. 12 & 14.)

21  Respondent argued that petitioner failed to properly exhaust some of his claims and that the

22  remaining claims lacked merit.   Petitioner disputed respondent's arguments and requested an

REPORT AND RECOMMENDATION
PAGE -1

01 evidentiary hearing. (Dkt. 21.)

02      Upon the Court's request, respondent provided a supplemental answer on the issue of

03 procedural default.   (Dkt. 23.)   Petitioner thereafter sought to amend his petition by

04 abandoning his unexhausted claims and adding two additional claims, and again requested an

05 evidentiary hearing.   (Dkts. 38 & 46.)   The Court granted the motion to amend.   (Dkt. 48.)

06 Petitioner subsequently submitted a motion for a stay so that he could obtain discovery in state

07 court (Dkt. 50), and respondent submitted a second supplemental answer and supplemental

08 administrative record (Dkts. 51 & 53).   The Court noted both the motion and second

09 supplemental answer for consideration.   (Dkt. 54.)   Respondent opposed the motion to stay.

10 (Dkt. 55.)   Petitioner failed to submit either a reply in support of his motion or a response to the

11 second supplemental answer.

12      The Court has now considered the record relevant to the grounds raised by petitioner,

13 including all hearing transcripts, as well as petitioner's requests for a stay and evidentiary

14 hearing.   For the reasons discussed herein, it is recommended that petitioner's request for a

15 stay be denied, and that his habeas petition be denied without an evidentiary hearing and this

16 action dismissed.

17                                      I

18      The Washington Court of Appeals described petitioner's case as follows:

19           On the morning of May 19, 2005, an apartment manager called police to
        investigate blood found on and around his front door and that of the next
20      apartment, where Nancy Seise lived with her boyfriend Eric Jones.   The
        manager reported hearing Seise scream and pound on his door in the middle of
21      the night, but he did not discover the blood until morning.   Upon entering the
        apartment, Seattle Police Officer Osborne observed more blood and discovered
22      Seise and Jones lying in bed.   Police arrested Jones.   Emergency medical

REPORT AND RECOMMENDATION
PAGE -2

personnel transported Seise to a hospital for treatment of multiple bruises and lacerations.

Following police investigation, the State charged Jones with first degree assault, felony harassment, first degree rape, and unlawful imprisonment. At trial, Seise, an admitted "crack" cocaine user, testified that she quarreled with Jones on the evening of May 18 about the amount of time he spent at a nearby "crack house." After yelling and arguing and a physical scuffle in the street, they returned to their apartment where Seise changed into pajamas and a robe and got into bed. Jones joined Seise in the bed, where she rebuffed his sexual advance.

According to Seise, Jones left the room and then returned and began hitting her in the back of the head. When Seise tried to get away and fell between the bed and wall, Jones continued hitting her in the head and face and shouting at her. When she put up her hands to defend herself, she felt sharp pains going through her hands but could not see what was happening in the dark room. He suddenly stopped, saying, "I don't believe it. You should be dead by now. You've got the hardest head. . . . I actually broke the handle to this knife on your head."

Seise testified that she crawled out from between the bed and the wall and lay on the floor where Jones then hovered over her asking her how she wanted to die and telling her stories of what he had done to other women. At one point, Jones told her that she had to kill or be killed and handed her a knife and then laughed at her as she lay on the floor holding up the knife. She asked him for a glass of water. When he left the bedroom to get the water, Seise ran out of the apartment and pounded on the apartment manager's door screaming for help. Then she ran out to the street screaming, but Jones followed and dragged her back into their apartment. Jones then prevented her from escaping through the back door. Later, Jones carried Seise to the bed and raped her.

Jones testified that they fought that evening because Seise was high on crack and accused him of having an affair with another woman at the crack house. Jones had also smoked crack and had some alcohol that evening. When Seise physically attacked him in the street, they both fell onto the pavement and Seise [scraped] her hand and hurt her knee. After they returned home, Seise continued arguing with him about the other woman. Then as Jones sat on the couch, Seise held a knife to his throat and started to cut his neck until he jerked away and she dropped the knife. Seise got another knife and stabbed at Jones, slashing his arm twice. Attempting to grab the knife, Jones wrestled Seise to the floor and pulled the knife out of her hands, inadvertently cutting her finger.

REPORT AND RECOMMENDATION
PAGE -3

01        Jones then admitted that he became "extremely aggravated" by Seise's actions and acted on "instinct" and hit her with his fist several times "to subdue

02 her."  Jones testified that when he returned from the kitchen with a glass of water for Seise, he found the door wide open and heard her outside screaming.

03 He admitted that he went after her, grabbed her and dragged her back into the apartment.  When she wanted to go out the back door for a smoke, he told her

04 that she didn't look good enough to go outside.  According to Jones, they sat in the living room for 30 to 45 minutes and discussed what to do about their

05 situation.  They agreed that they would not call the police and that they would not tell the truth about their fight because each one had attacked the other. Jones

06 suggested that she go to the hospital, but Seise refused because she knew of outstanding warrants for her arrest.  Then he helped her to bed, and they both

07 went to sleep.

08        Jones admitted that he was wrong to hit Seise.  He denied using a weapon to hit her, showing a silver ring that he had been wearing that was

09 compressed to an oval shape by the impact of his fist.  He denied intentionally cutting her finger, he denied threatening to kill her, and he denied the rape.

10

11        The State presented evidence to demonstrate the extent of Seise's injuries, including pictures of the blood found in and around the apartment,

12 pictures of Seise after the incident, testimony from an emergency room doctor, and Seise's testimony.  Seise testified that she had permanent sensory loss in

13 her right ring finger.

14        The jury found Jones guilty of first degree assault and felony harassment while armed with a deadly weapon and unlawful imprisonment.  The jury

15 acquitted Jones of first degree rape and the lesser included offense of second degree rape.  The trial court imposed a standard range sentence.

16 (Dkt. 14, Ex. 5 at 1-4.)

17        Petitioner filed a notice of appeal with the Washington Court of Appeals, raising the

18 following assignments of error:

19        1.     Defense counsel deprived the appellant of his constitutional right to the effective assistance of counsel by (1) continually failing to object to

20 irrelevant and prejudicial evidence that directly undermined the defense theory and (2) by failing to object to the lack of a jury instruction defining "substantial

21 bodily harm."

        2.     The prosecutor's improper direct examination of two police

22 officers, which elicited irrelevant, prejudicial and inflammatory evidence, as

REPORT AND RECOMMENDATION
PAGE -4

01   well as closing argument, which blatantly appealed to the passions and
sympathy of the jury, constituted flagrant and ill intentioned misconduct that
02   could not have been cured by instructions.

03        3.    The trial court erred by failing to find the appellant's felony
harassment and unlawful imprisonment convictions constituted the same
04   criminal conduct.

05 (*Id.*, Ex. 2 at 1.)   Petitioner filed a statement of additional grounds *pro se*, raising the following

06 issues:

07        1.    According to jury [instructions] definition assault in the first
degree given to the jury, "great bodily harm" was never established.
08

09        2.    Defense counsel deprived the appellant of his right to effective
assistance of counsel by (1) continually failing to object to irrelevant and
prejudicial evidence that directly undermind[] the defense theory and (2) by
10   failing to object to the lack of a jury instruction defining "substantial bodily
harm."

11

12 (*Id.*, Ex. 3 at 1.)   Also, in an additional brief filed pro se, petitioner presented the following

13 issues:

14   Did the court and/or jury err in examination of the . . . expert witnesses regarding
the <u>extent</u> of injuries the alleged victim received?
15

16   . . .

   Could the court and /or jury make an accurate [depiction] of the extent of the
17   injuries received by the alleged victim listening to the states expert witness?

18   . . .

19   Did the court and/or jury err in the conviction of deadly weapon enhancement
and assault 1 due to charges and opening and closing statements inconsistent
20   with evidence?

21   The prosecutor maliciously created a monster in the jury's eyes by charging the
defendant of assault 1 with a deadly weapon enhancement and rape with
22   insufficient evidence.

REPORT AND RECOMMENDATION
PAGE -5

01 . . .

02 Victims testimony was based in a room where no weapons were found by the
Seattle Crime Team Scene team detectives and few pictures of the case were
03 taken.

04 Did the court err in excluding hearsay that was within the hearsay rule?

05 . . .

06 Prosecution was aware of the fact the alleged victim possessed a knife.  Plus,
prosecution was aware they had no physical evidence proving defendant had
07 possession of a deadly weapon.

08 Did the court and/or jury err in the charge/or conviction of the deadly weapons
enhancement?
09

. . .
10

The alleged victim possessed the knife.
11

Did the court and/or jury err in allowing or conviction of the deadly weapons
12 enhancement when there was insufficient evidence of the defendant possessing
it?
13

The prosecutor [maliciously] created a story of the defendant possessing the
14 knife with full knowledge of taped testimony of the alleged victim possessing it.
There was only evidence of the victims DNA on the knife's handle.   There was
15 no physical evidence of the [defendant] possessing the knife in exhibit No. 87 or
the black handled knife that was not tested at all.  Plus testimony from the
16 alleged victim that she never saw the [defendant] with a knife.

17 . . .

18 Officer Kevin Runolson picked up the black handle knife that was tainted by the
alleged victim stepping on the knife and the fact that Seattle C.S.I. did not find
19 the knife.   The court and/or jury had insufficient evidence to convict the
defendant of a deadly weapon enhancement.
20

. . .
21

The prosecution [maliciously] created a story of the defendant attacking the
22 hands of the alleged victim with a knife when in fact evidence and testimony

REPORT AND RECOMMENDATION
PAGE -6

01   proves defendant did not attack the alleged victim with a knife.

02   Did the court and/or jury err in examination of expert witnesses and testimony regarding how the alleged victim's hand injuries happened?

03   . . .

04

05   The prosecutor [maliciously] created a story inflaming the jurors of the defendant possessing a knife with <u>absolutely</u> no physical evidence of the defendant possessing the weapon.

06

07   Did the trial court err in not allowing expert testimony to exonerate allegations by the state or prosecutor?

08   Prosecutor may not assume prejudicial facts not in evidence, nor may she insinuate possession of personal knowledge of facts not offered in evidence.

09

10   . . .

11   [Defendant] wished to replace his counsel due to <u>conflict of interest</u>, but the hearing court said they lacked jurisdiction in exercising my sixth amendment rights.

12

13   [Defendant] believes this was trial court abuse of power.

14   Did trial court err in not allowing [defendant] to replace his ineffective counsel?

15   "Conflict of interest"   A trial court has a limited duty to avoid potential conflicts of interest.   The court must initiate an inquiry if it <u>knows</u> or <u>reasonably should know</u> that a potential conflict exists.   When the trial court has notice of

16   potential conflict, but fails to make such an inquiry, the reviewing court will presume a violation of the sixth amendment, "<u>right to counsel</u>".   As stated by

17   the constitution.

18   . . .

19   [Defendant] wished to replace his counsel due to <u>conflict of interest</u>.   The court was aware of many conflicts, but did not exercise their authority to grant new

20   representation.

21   From [defendant's] testimony, Judge Kessler knew that the defense could not be properly prepared for trial due to exculpatory evidence not used by deficient

22   defense counsel.

REPORT AND RECOMMENDATION
PAGE -7

01          Did trial court err in not allowing [defendant] to replace his ineffective counsel?

02          . . .

03          [Conviction on assault one and deadly weapons enhancement done with
04          prejudice and insufficient evidence.  Conflict of interest and ineffective
            assistance of counsel in failing to seek out and/or investigate key defense
05          witnesses, failing to form strategic defense tactic or any plan to challenge the
            charges.]

06

07   (*Id.*, Ex. 3A.)   The Court of Appeals affirmed the conviction.  (*Id.*, Ex. 5.)

08          Petitioner sought review in the Washington Supreme Court, presenting the following

09   issues:

10          1.      Jones's defense theory was he was guilty of the lesser degree of
            second degree assault rather than the charged offense of assault in the first
11          degree.   Nevertheless, counsel stood mute while two experienced police
            officers, in response to questions from the prosecutor and in gratuitous and
12          inflammatory nonresponsive answers, under mined the theory by graphically
            describing the complainant's head and facial injuries.   For example, one officer
13          testified, "They couldn't have done a better job in a Hollywood movie." . . .
            This evidence went to the heart of the defense theory.   Did trial counsel render
14          ineffective assistance in violation of the sixth amendment and article I, section
            22, such that review is appropriate under RAP 13.4(b)(3)?

15

16          2.      In her direct examination of the two aforementioned police
            officers, the prosecutor improperly elicited testimony designed to inflame and
17          appeal to the passions and sympathies of the jury.   During closing and rebuttal
            arguments, the prosecutor made remarks designed to do the same and also
18          implored jurors to serve as the conscience of the community by finding Jones
            guilty.   The prosecutor's acts amounted to flagrant and ill-intentioned
19          misconduct and deprived Jones of his due process right to a fair trial.   Does the
            prosecutor's behavior raise a significant question of constitutional law
20          warranting review under RAP 13.4(b)(3)?

21          3.      Jones raised several issues in his Statement of Additional
            Grounds, including whether the trial court denied his sixth amendment right to
22          hire counsel of his choice by denying his request to fire retained counsel 18 days
            before the first day of trial.   Does this issue raise a significant constitutional

REPORT AND RECOMMENDATION
PAGE -8

01        issue worthy of review under RAP 13.4(b)(3) and do his other issues meet the
          criteria of RAP 13.4(b)(3) and/or (b)(4)?

02

03   (*Id.*, Ex. 6 at 1-2.)   The Supreme Court denied review.   (*Id.*, Ex. 7.)

04        Following the voluntary dismissal of a first petition (*see* Dkt. 12 at 10 n.1), petitioner

05   submitted a second personal restraint petition in the Court of Appeals alleging unconstitutional

06   jury selection.   (*Id.*, Ex. 8.)   The court dismissed the petition.   (*Id.*, Ex. 9.)   Raising the same

07   issue, petitioner petitioned for review.   (*Id.*, Ex. 10.)   The Supreme Court denied review.

08   (*Id.*, Ex. 11.)

09        Petitioner filed a third personal restraint petition in the Court of Appeals alleging the

10   trial court denied him his right to effective counsel by failing to grant his motion for new

11   counsel.   (*Id.*, Ex. 12.)   The court dismissed the petition.   (*Id.*, Ex. 13.)   Raising the same

12   issue, petitioner petitioned for review.   (*Id.*, Exs. 14 & 14A.)   The Supreme Court denied

13   review, noting petitioner had already pursued this issue on direct appeal.   (*Id.*, Ex. 15.)   The

14   Supreme Court also denied a subsequent motion to modify.   (*Id.*, Exs. 16 & 17.)

15        Finally, petitioner filed a fourth personal restraint petition arguing miscalculation of his

16   offender score.   (*Id.*, Ex. 18.)   The Court of Appeals dismissed the petition (*id.*, Ex. 8) and

17   petitioner did not petition for further review (*see* Dkt. 12 at 11).

18                                             II

19        Petitioner here raises the following grounds for relief:

20        1.      Prosecutorial misconduct in direct examination of two police officers
                  and in closing arguments.

21

22        2.      Ineffective assistance of counsel in failing to object to the prosecutor's
                  closing/rebuttal statements.

REPORT AND RECOMMENDATION
PAGE -9

01

02          3.      Improper jury selection because the jury venire did not represent a "fair
            cross-section" of the community.

03  (Dkts. 6 & 38.)[1]

04          Respondent concedes exhaustion of these claims in state court, but maintains that the

05  claims lack merit.   The Court agrees that the claims appear to have been properly exhausted.

06  However, prior to addressing the merits of petitioner's claims, the Court first considers

07  petitioner's request for a stay in order to obtain discovery, as well as his request for an

08  evidentiary hearing.

09                                          III

10          Petitioner seeks a stay in this matter to allow time for him to obtain discovery in relation

11  to his fair cross-section claim, specifically, an exhibit "to demonstrate the racial make-up of his

12  jury venire and/source list."   (Dkt. 50).   His motion seeking a stay, filed in late October 2010,

13  indicated that his request for the discovery in question had been denied in King County

14  Superior Court and in the Washington Court of Appeals, and that he had filed a petition for

15  review in the Washington Supreme Court.   (*Id.*)   Petitioner also, as stated above, requests an

16  evidentiary hearing in this matter.

17          The Court finds that petitioner's claims can be resolved by reference to the state court

18  record and, therefore, that an evidentiary hearing is not necessary.   *See Totten v. Merkle*, 137

19  F.3d 1172, 1176 (9th Cir. 1998) ("[A]n evidentiary hearing is not required on issues that can be

20  resolved by reference to the state court record.")   Nor does the Court find any basis for

21  _____

22          1 Petitioner abandoned unexhausted claims contained in his first petition. (*See* Dkt. 46.) Because it was
    not entirely clear whether petitioner also intended to abandon an exhausted ineffective assistance of counsel claim
    in that petition (*see* Dkt. 48 at 2 n.1), the Court addresses that claim herein.

REPORT AND RECOMMENDATION
PAGE -10

01   granting petitioner's request for a stay.  As observed by respondent, if petitioner were to

02   succeed in obtaining the above-described discovery, he would presumably seek to submit that

03   discovery to this Court in support of his fair cross-section claim.  However, for the reasons

04   described below, the Court finds that a request for such an expansion of the record would not be

05   warranted.

06        Pursuant to Rule 7 of the Rules Governing § 2254 cases, the Court may expand the

07   record without holding an evidentiary hearing.   However, a petitioner seeking expansion of the

08   record with documents not presented in state court must demonstrate he "was not at fault in

09   failing to develop that evidence in state court, or (if he was at fault) if the conditions prescribed

10   by § 2254(e)(2) were met."  *Holland v. Jackson*, 542 U.S. 649, 652-53 (2004); *Cooper-Smith

11   v. Palmateer*, 397 F.3d 1236, 1241 (9th Cir. 2005).   Section 2254(e)(2) requires that the "claim

12   was based either on a new retroactive rule of constitutional law, or on a 'factual predicate that

13   could not have been previously discovered through the exercise of due diligence.'"

14   *Cooper-Smith*, 397 F.3d at 1241-42 (*quoting* §2254(e)(2)).

15        Petitioner did not submit the documentary evidence in question in support of his claim

16   at the state court level.  (*See generally* Dkt. 14, Ex. 9 (finding no support for petitioner's

17   fair-cross section claim).)   He does not here demonstrate that he was not at fault in failing to

18   develop that evidence in state court.   Nor does petitioner show either that his claim is based on

19   a new retroactive rule of constitutional law or on a factual predicate that could not have been

20   previously discovered through due diligence.   Accordingly, even if petitioner were to obtain

21   the evidence in question, he would not now be entitled to submit that evidence to this Court for

22   consideration in relation to his habeas claims.   Petitioner's motion for a stay should, therefore,

REPORT AND RECOMMENDATION
PAGE -11

01  be denied.   The Court now considers the merits of petitioner's claims.

02                                                  IV

03          Under the Anti-Terrorism and Effective Death Penalty Act, a habeas corpus petition

04  may be granted with respect to any claim adjudicated on the merits in state court only if the state

05  court's decision was contrary to, or involved an unreasonable application of, clearly established

06  federal law, as determined by the United States Supreme Court.   28 U.S.C. § 2254(d).   In

07  addition, a habeas corpus petition may be granted if the state court decision was based on an

08  unreasonable determination of the facts in light of the evidence presented.   *Id.*

09          Under the "contrary to" clause, a federal habeas court may grant the writ only if the state

10  court arrives at a conclusion opposite to that reached by the Supreme Court on a question of

11  law, or if the state court decides a case differently than the Supreme Court has on a set of

12  materially indistinguishable facts.   *See Williams v. Taylor*, 529 U.S. 362 (2000).   Under the

13  "unreasonable application" clause, a federal habeas court may grant the writ only if the state

14  court identifies the correct governing legal principle from the Supreme Court's decisions but

15  unreasonably applies that principle to the facts of the prisoner's case.   *Id.*

16          The Supreme Court has made clear that a state court's decision may be overturned only

17  if the application is "objectively unreasonable."   *Lockyer v. Andrade*, 538 U.S. 63, 69 (2003).

18  In addition, if a habeas petitioner challenges the determination of a factual issue by a state court,

19  such determination shall be presumed correct, and the applicant has the burden of rebutting the

20  presumption of correctness by clear and convincing evidence.   28 U.S.C. § 2254(e)(1).

21          For the reasons described below, the Court concludes that petitioner's claims lack merit

22  and should be denied.

REPORT AND RECOMMENDATION
PAGE -12

01  A.      Prosecutorial Misconduct

02          In analyzing a claim of prosecutorial misconduct, the appropriate standard of review is

03  the narrow one of due process and not the broad exercise of supervisory power. *See Darden v.*

04  *Wainwright*, 477 U.S. 168, 181 (1986).  *See also Smith v. Phillips*, 455 U.S. 209, 219 (1982)

05  ("the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the

06  fairness of the trial, not the culpability of the prosecutor").  "To warrant habeas relief,

07  prosecutorial misconduct must 'so infect the trial with unfairness as to make the resulting

08  conviction a denial of due process.'"  *Davis v. Woodford*, 384 F.3d 628, 644 (9th Cir. 2003)

09  (*quoting Darden*, 477 U.S. at 181).

10          Petitioner asserts prosecutorial misconduct in the direct examination of two police

11  officers and in the closing argument.  The state court discussed the direct examination of the

12  police officers in analyzing petitioner's ineffective assistance of counsel claim:

13              The defense theory of the case was that Jones committed second degree
              assault rather than first degree because (1) he did not use a weapon; (2) he only
14            intended to subdue Seise, not to injure her; and (3) Seise's injuries did not
              constitute "great bodily harm."   Jones identifies the following occasions where
15            defense counsel failed to object to irrelevant and prejudicial testimony that
              undermined this theory:   Officer Osborne's testimony (1) comparing the
16            amount of blood at the apartment with that he observed in other cases; (2) giving
              his "expert" opinion about the common reluctance of domestic violence victims
17            in other cases to speak with police; and (3) repeating his statement to Seise at the
              scene:   "He really beat the shit out of you;" and Detective John Vradenburg's
18            testimony regarding his emotional response to Seise's appearance three days
              after the incident, that he had "seen a lot in [his] day" and was "struggling with
19            this right now," that she was "ghoulish" and "[t]hey couldn't have done a better
              job in a Hollywood movie," but that she was a "trooper" and a "tough gal."
20            Jones contends that this testimony emphasized the seriousness of Seise's
              injuries, encouraged the jury to sympathize with Seize, and encouraged the jury
21            to adopt the police officers' view of Seise's truthfulness.

22  (Dkt. 14, Ex. 5 at 5-6.)   The court noted that, under Washington law, the "[f]ailure to object to

REPORT AND RECOMMENDATION
PAGE -13

01  an improper remark constitutes a waiver of error unless the remark is so flagrant and ill

02  intentioned that it cause an enduring and resulting prejudice that could not have been

03  neutralized by an admonition to the jury."  (*Id.* at 7-8; citation omitted.)   The court thereafter

04  analyzed the issue of prosecutorial misconduct as follow:

05         Jones contends that the prosecutor committed flagrant and ill intentioned
       misconduct during her direct examination by asking Officer Osborne about the

06     amount of blood at the scene and his "He really beat the shit out of you"
       comment and by stating during Detective Vradenburg's testimony, "Sounds like

07     it was pretty emotional."   But Jones merely claims that these questions led to
       irrelevant, prejudicial, and inflammatory testimony from both officers.

08     Because Jones fails to argue or demonstrate that a timely objection and trial
       court admonition to the jury could not have prevented or neutralized any

09     prejudicial response to these questions, any error is waived.

10         Jones also contends that the prosecutor committed flagrant and ill
       intentioned misconduct during argument by appealing to the passions and

11     sympathies of the jury and suggesting that only a guilty verdict would fulfill the
       duty of the jurors to serve as the community conscious and be guardians of the

12     law.   In particular, the prosecutor argued:

13             Given all of the evidence that we have heard over the course
           of three or four days last week, it goes without saying that the defendant

14         needs to be held accountable for his acts of brutality on that day.   Which
           is why you're here.   And this is the point in the trial where you all are

15         going to be empowered to do just that, to come in here and declare your
           verdicts and look the defendant in the face and tell him, no, you cannot

16         do this, this is not right, and find some justice for Nancy Seise.

17         After reviewing certain jury instructions and discussing the weight of the
       evidence and credibility of the witnesses, the prosecutor concluded:

18

19             On May 19th, 2005, Nancy Seise ran from the apartment.
           And she ran and pounded on Mr. Alamillo's door looking for people
           who could help her.   She ran into the street, hoping that a car would pass

20         by, that someone would stop and help her.   Screaming into the night,
           hoping that someone would respond to her cries for help.   Hoping that

21         anyone, stranger or friend, would save her from the defendant.   And
           when defendant ran outside and drug her back in, she came in screaming,

22         he set her on the ground, he told her, stop, why are you even bothering,

REPORT AND RECOMMENDATION
PAGE -14

01          no one is going to help a woman like you.

02                  Ladies and gentlemen, you are the strangers and friends that
            Nancy was looking for that night.   And it is up to you to bring an end to
03          this story with justice.   And that justice can be found in your verdicts,
            guilty as charged.

04
                    Even if the prosecutor's remarks here constitute an improper appeal to
05          the passions of the jury, Jones fails to identify anything in the record to support a
            conclusion that it was flagrant or ill intentioned or that any resulting prejudice
06          could not be neutralized by an admonition to the jury.   Rather, the record
            reflects that throughout her argument, the prosecutor urged the jury to follow the
07          court's instructions, weight the credibility of the witnesses, and reach a decision
            based on the evidence.   Any error is waived.

08

09    (*Id.* at 8-9.)

10          Petitioner here argues that the prosecutor's questions to the police officers were

11    prejudicial in that they were designed to inflame the passions of the jury and to misdirect the

12    jury's attention from the facts.   He asserts that the prosecutor "repeat[ed] the veteran police

13    officer's statement [that] Jones 'beat the shit out of Seise' and coaxe[d] Vradenburg, another

14    seasoned professional[,] to describe the complainant's injuries as so serious as to avoid

15    Hollywood replication, as well as to admit his emotions affected his ability to testify."   (Dkt.

16    38-1 at 2.)   Petitioner notes that "[a] police officers's testimony is particularly persuasive and

17    may be considered more reliable and trustworthy than the testimony of others."   (*Id.* (*citing*

18    *State v. Demery*, 144 Wn.2d 753, 763, 30 P.3d 1278 (2001) (discussing police officer's opinion

19    testimony as to guilt) and *United States v. Espinosa*, 827 F.2d 604, 612-13 (9th Cir. 1987)

20    (discussing expert testimony offered by a police officer).)

21          Petitioner also claims that the prosecutor's statements in closing were improperly

22    intended to inflame juror emotions and, further, improperly implied that the jury's decision

REPORT AND RECOMMENDATION
PAGE -15

01  could help solve a social problem.  *See United States v. Tulk*, 171 F.3d 596, 599 (8th Cir. 1999)

02  ("A prosecutor should not urge a jury to convict for reasons other than the evidence; arguments

03  intended to inflame juror emotions or implying that the jury's decision could help solve a social

04  problem are inappropriate.")   He states that the prosecutor here "went too far by pressuring the

05  jury[,]" suggesting it was their "duty to find guilt[,]" and asking them to act as the "community

06  conscience" to help Seise.  (Dkt.  38-1 at 3 (*citing United States v. Lester*, 749 F.2d 1288,

07  1301 (9th Cir. 1984)).[2]

08          Respondent  provides  detailed  argument  in  response  to  petitioner's  prosecutorial

09  misconduct claims.   (*See* Dkt. 51 at 2-9.)   For the reasons described below, the Court agrees

10  with respondent that petitioner's claims lack merit.

11          In order to assess a claim that a prosecutor's questions or comments constitute a

12  violation of due process, the Court must examine the entire proceedings and place the

13  challenged questions and comments in context.  *See Greer v. Miller*, 483 U.S. 756, 765-66

14  (1987).  "It 'is not enough that the prosecutors' [questions or] remarks were undesirable or

15  even universally condemned.'" *Darden*, 477 U.S. at 181 (*quoted source omitted*); *United States

16  v. Geston*, 299 F.3d 1130, 1136 (9th Cir. 2002) ("A prosecutor's improper questioning is not in

17  ────────────────────

18          2 Petitioner also includes, in his amended petition, an argument about a different portion of the
    prosecutor's closing remarks. (*See* Dkt. 38-1 at 3.) He takes issue with an example given by the prosecutor as not
    properly reflecting the difference between assault in the first and second degrees, and appears to aver that the

19  prosecutor expressed a personal opinion as to his guilt. (*Id.*) However, it does not appear that petitioner exhausted
    any such claims. Moreover, petitioner does not accurately describe the challenged portion of the prosecutor's

20  closing argument. (*See* Dkt. 14, Ex. 21 at 139-40 (the prosecutor was discussing why the jury was not to consider
    the lesser offense before considering the crime of assault in the first degree, and stated: "And if you were to do that,
    if you were just to default to the easy question, you would completely throw away all of the other evidence of what

21  happened in this case. Namely, the extent of Nancy's injuries and what was in the defendant's mind during the
    brutal hours. So you have to make the hard decision, you have to go with the higher crime first. And, frankly, given

22  the evidence in this case, I don't think you'll go down that road with any of those crimes.")) For these reasons, this
    argument requires no further consideration.

REPORT AND RECOMMENDATION
PAGE -16

01 and of itself sufficient to warrant reversal.") (citing Ortiz v. Stewart, 149 F.3d 923, 934 (9th Cir.

02 1998)).   The question is whether it can be said that they "'so infected the trial with unfairness

03 as to make the resulting conviction a denial of due process.'"   *Id.* (*quoting Donnelly v.*

04 *DeChristoforo*, 416 U.S. 637, 643 (1974)); *Geston*, 299 F.3d at 1136 ("It must also be

05 determined whether the prosecutor's actions 'seriously affected the fairness, integrity, or public

06 reputation of judicial proceedings, or where failing to reverse a conviction would result in a

07 miscarriage of justice.'") (*citing United States v. Tanh Huu Lam*, 251 F.3d 852, 862 (9th Cir.

08 2001)).

09      As averred by petitioner, "[p]rosecutors may not make comments calculated to arouse

10 the passions or prejudices of the jury."   *United States v. Leon-Reyes*, 177 F.3d 816, 823 (9th

11 Cir. 1999).   Accordingly, in closing argument:

12      A prosecutor may not urge jurors to convict a criminal defendant in order to
      protect community values, preserve civil order, or deter future lawbreaking. The
13      evil lurking in such prosecutorial appeals is that the defendant will be convicted
      for reasons wholly irrelevant to his own guilt or innocence. Jurors may be
14      persuaded by such appeals to believe that, by convicting a defendant, they will
      assist in the solution of some pressing social problem. The amelioration of
15      society's woes is far too heavy a burden for the individual criminal defendant to
      bear.

16

17 *Id.*   (*quoting United States v. Koon*, 34 F.3d 1416, 1443 (9th Cir. 1994) (*quoting United States*

18 *v. Monaghan*, 239 U.S. App. D.C. 275, 741 F.2d 1434, 1441 (D.C. Cir. 1984)), *rev'd on other*

19 *grounds by* 518 U.S. 81 (1996))).   However, so long as not "specifically designed to inflame

20 the jury[,]" a prosecutor may make an appeal for the jury to act "as a conscience of the

21 community[.]"   *Lester*, 749 F.2d at 1301 (*cited source omitted*).   *Accord Leon-Reyes*, 177

22 F.3d at 823; *United States v. Williams*, 989 F.2d 1061, 1072 (9th Cir. 1993).   Moreover,

REPORT AND RECOMMENDATION
PAGE -17

attorneys are afforded "reasonably wide latitude in making their closing arguments[,]" and "[i]mproprieties are not reversible error unless they are so gross as to probably prejudice the defendant, and the prejudice is not neutralized by the trial judge." *Lester*, 749 F.2d at 1301 (*citing United States v. Birges*, 723 F.2d 666, 671-72 (9th Cir. 1984) and *United States v. Lane*, 708 F.2d 1394, 1399 (9th Cir. 1983) (remarks at closing must be highly prejudicial and affect substantial rights to constitute reversible error)).

Officer Joseph Osborne was the first law enforcement officer dispatched to the scene of the crime.   In his questioning, the prosecutor reasonably sought relevant information concerning Osborne's approach to the investigation of the crime, his direct contact with the victim, and his fifteen years of police experience.   (*See, e.g.,* Dkt. 53, Ex. 22 at 31-32 (asking: "Over the course of your 15 years, responding to these types of call-outs, how would you characterize the blood that you observed outside the apartment versus other calls you responded to?"; and then: "Given the amount of blood and Mr. Alamillo's statements to you, what did you decide to do?"))   The prosecutor did twice repeat Osborne's statement – "He really beat the shit out of you".   (*Id.* at 42-43.)   Yet, whether or not appropriate, it is not at all apparent that the repetition of this phrase was intended to inflame the jury.   Indeed, in so doing, the prosecutor procured relevant testimony as to the dynamics of the crime and the relationship between petitioner and Seise, including the fact that Seise initially minimized the harm done to her and denied petitioner was the perpetrator.   (*Id.* at 42-43 (Osborne described Seise's response to the statement:   "She said: Just my head and body.   And stopped and got hesitant and said: Wait, wait, no, it wasn't him."; Osborne went on to explain that he had not been expecting an answer to the statement based on his prior experience with female domestic

01  violence victims, and that the minimizing of harm was "very common" in those situations).)

02  Petitioner fails to establish prosecutorial misconduct in the direct examination of Osborne.

03       Petitioner also fails to establish that the prosecutor coaxed or otherwise committed

04  prosecutorial misconduct in questioning Detective John Vradenburg, the lead detective

05  assigned to the case.  The bulk of Vradenburg's testimony to which petitioner takes issue

06  resulted from simple and highly relevant questions regarding how Seise looked several days

07  following the assault.  (*Id.*, Ex. 23 at 169-74 (Vradenburg's testimony as to petitioner's

08  "ghoulish" appearance resulted from the prosecutor asking: "How did she look that's different

09  than the photographs we have seen?", while his testimony that "[t]hey couldn't have done a

10  better job in a Hollywood movie[,]" followed the question:   "The doctor had testified a little bit

11  about bruising around the eye area, is that what you're talking about?").)   In stating – "Sounds

12  like it was pretty emotional as it was[]" – the prosecutor acknowledged Vradenburg's demeanor

13  on the stand.  (*See, e.g., id*. at 170-71 (Vradenburg explained why he had not asked Seise, at

14  the hospital, if she had been sexually assaulted: "Well, and I also wanted to wait on that until –

15  there's just – so much had happened to her, I felt that part of it could wait.   So I didn't ask her

16  about it that day."; the prosecutor thereafter stated:   "Sounds like it was pretty emotional as it

17  was[,]" prompting Vradenburg's reply: "Yeah.   Yeah.   I mean I've seen a lot in my day.   But

18  when you – as a detective, you get down to a bit of a more personal level with somebody, which

19  in patrol you typically don't.   That's why I'm struggling with this right now."))   Again, while

20  perhaps unnecessary and undesirable, it is not clear that the prosecutor's statement was

21  designed to inflame the passions of the jury or to misdirect the jury's attention from the facts.

22       Nor does petitioner establish that the challenged statements from the prosecutor's

REPORT AND RECOMMENDATION
PAGE -19

01 | closing argument were either intended to inflame the jury's emotions or generalized pleas for

02 | societal justice.  (*See* Dkt. 14, Ex. 21 at 130 and 152-52 ("Given all of the evidence that we

03 | have heard over the course of three or four days last week, it goes without saying that the

04 | defendant needs to be held accountable for his acts of brutality on that day.   Which is why

05 | you're here.   And this is the point in the trial where you all are going to be empowered to do

06 | just that, to come in here and declare your verdicts and look the defendant in the face and tell

07 | him, no, you cannot do this, this is not right, and find some justice for Nancy Seise."; "Ladies

08 | and Gentlemen, you are the strangers and friends that Nancy was looking for that night.   And it

09 | is up to you to bring an end to this story with justice.   And that justice can be found in your

10 | verdicts, guilty as charged.")   Instead, the prosecutor's comments were within the bounds of

11 | reasonable advocacy and tied directly to the evidence at hand.   *See, e.g., Lester*, 749 F.3d at

12 | 1301-02 (prosecutor's statement that "'we are all victims'" and that an acquittal would send a

13 | positive message that one could "stop people from talking to the FBI," when considered in

14 | conjunction with other evidence, did not "cross the line 'demarcating permissible oratorical

15 | flourish from impermissible comment calculated to incite the jury against the accused.'")

16 | (quoted source omitted).

17 |         Moreover, even assuming their impropriety, the prosecutor's questions to the police

18 | officers and his statements in closing, viewed in conjunction with the evidence as a whole,

19 | cannot be said to have prejudiced defendant.   The fact remains that, as discussed further below,

20 | petitioner did not dispute that he assaulted Seise; he challenged the degree of assault alleged.

21 | Petitioner's own testimony included, for instance, his admissions that he hit Seise with his first

22 | several times and was "extremely aggravated", as well as the statements: "And that was my

01  intent, not to make her look like a pulp, but to make her feel scared.  . . .   It was my intent to

02  scare her, not to do what I did."  (Dkt. 14, Ex. 21 at 29, 40, 55-60.)   Moreover, the prosecution

03  presented ample evidence to support its case, including "pictures of blood found in and around

04  the apartment, pictures of Seise after the incident, testimony from an emergency room doctor,

05  and Seise's testimony[, including] that she had permanent sensory loss in her right ring finger."

06  (*Id.*, Ex. 5 at 4.)

07      Also, the fact that the jury acquitted petitioner on the charges of first- and second-degree

08  rape (*id.*), demonstrates that they were not unduly swayed by passion and remained able to

09  render a verdict based on the evidence before them.  *See, e.g., Tulk*, 171 F.3d 599-600 (even

10  though the prosecutor inappropriately "suggested the jury react to factors outside of the

11  evidence", the petitioner did not show prejudice: "Much incriminating evidence was admitted

12  against Tulk over the course of the nine day trial. The fact that the jury acquitted co-defendant

13  Cookson and Tulk on one of the drug counts shows that it was not swayed by passion and was

14  able to analyze the evidence presented against each defendant on each count.")   Finally, it is

15  undisputed that the judge in this case properly instructed the jury with respect to the difference

16  between arguments and evidence.  (Dkt. 23, Ex. 22 at 6.)   *See Ortiz-Sandoval v. Gomez*, 81

17  F.3d 891, 898 (9th Cir. 1996) ("The arguments of counsel are generally accorded less weight by

18  the jury than the court's instructions and must be judged in the context of the entire argument

19  and the instructions.") (*citing Boyde v. California*, 494 U.S. 370, 384 (1989)).

20      In sum, neither the prosecutor's questions, nor the challenged statements in a brief

21  portion of the prosecutor's closing remarks can be said to have so infected the trial with

22  unfairness as to result in a denial of due process.  *See, e.g., Hall v. Whitley*, 935 F.2d 164,

REPORT AND RECOMMENDATION
PAGE -21

01  165-66 (9th Cir. 1991) (dismissing prosecutorial misconduct claim where prosecutor's remarks

02  were "isolated moments in a three day trial.")   Petitioner fails to establish that the state court

03  decisions were contrary to, or an unreasonable application of, federal law, or to otherwise

04  establish prosecutorial misconduct.   As such, his allegations of prosecutorial misconduct

05  should be denied.

06  B.   <u>Ineffective Assistance of Counsel</u>

07      The Sixth Amendment of the United States Constitution guarantees a criminal

08  defendant the right to effective assistance of counsel.   *Strickland v. Washington*, 466 U.S. 668,

09  687 (1984).   Courts evaluate claims of ineffective assistance of counsel under the two-prong

10  test set forth in *Strickland*.   Under that test, a defendant must prove that (1) counsel's

11  performance fell below an objective standard of reasonableness and (2) a reasonable probability

12  exists that, but for counsel's error, the result of the proceedings would have been different.   *Id.*

13  at 687-694.

14      When considering the first prong of the Strickland test, judicial scrutiny must be highly

15  deferential.   *Id.* at 689.   There is a strong presumption that counsel's performance fell within

16  the wide range of reasonably effective assistance.   *Id.*   The Ninth Circuit Court of Appeals has

17  made clear that "'[a] fair assessment of attorney performance requires that every effort be made

18  to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's

19  challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'"

20  *Campbell v. Wood*, 18 F.3d 662, 673 (9th Cir. 1994) (*quoting Strickland*, 466 U.S. at 689).

21      The second prong of the Strickland test requires a showing of actual prejudice related to

22  counsel's performance.   In order to establish prejudice, a petitioner "must show that there is a

REPORT AND RECOMMENDATION
PAGE -22

01 reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

02 would have been different.   A reasonable probability is a probability sufficient to undermine

03 confidence in the outcome."   *Strickland*, 466 U.S. at 694.

04    The reviewing court need not address both components of the inquiry if an insufficient

05 showing is made on one component.   *Id.* at 697.   Furthermore, if both components are to be

06 considered, there   is no prescribed order in which to address them.   *Id.*

07    Petitioner maintains the ineffectiveness of his counsel in failing to object to the

08 above-described closing remarks of the prosecutor and in relation to the testimony of the police

09 officers.   (*See* Dkt. 6 at 8.)   In considering petitioner's claim of ineffective assistance of

10 counsel, the state court correctly identified the governing federal law and described the

11 challenged direct examination and closing arguments as reflected above.   (Dkt. 14, Ex. 5 at

12 5-9.)   The court subsequently analyzed the claim as follows:

13    But even if the testimony [of the police officers] was objectionable, our
   review of the entire record reveals that defense counsel's legitimate trial strategy
14    was to present Jones as a reasonable, caring, and responsible person who
   willingly admitted that while he was angry and under the influence of drugs and
15    alcohol, he had gone too far in response to Seise's drug enhanced attacks and
   committed second degree assault.   In his testimony, Jones described how the
16    blood came to be in the various places it was found, and offered an alternative
   explanation for Seise's inconsistent answers to police questions at the scene.   A
17    decision not to object to the identified testimony is consistent with an attempt to
   demonstrate to the jury that Jones had nothing to hide and was willing to admit
18    he was wrong and face the consequences.

19    Also, defense counsel's theory regarding the extent of Seise's injuries
   hinged on whether those injuries involved a "*significant permanent* loss or
20    impairment of the function of any bodily part of organ."   (Emphasis added).
   Given the pictures of the blood at the apartment, as well as the pictures of
21    Seise's injuries, defense counsel could legitimately decide that Jones could not
   credibly dispute that the injuries appeared significant at the time of the police
22    investigation, even based solely on the amount of blood.   Instead, defense

REPORT AND RECOMMENDATION
PAGE -23

01   counsel focused on the fact that the only permanent injury Seise claimed to
suffer was a sensory loss in one finger and that the doctor described her injuries
02   as "moderate," and then argued that even the minimal loss of sensation in her
finger may have been avoided had Seise followed the doctor's advice to return
03   for surgery.

04   (*Id.* at 5-7.)

05       The state court accurately depicted both the theme of the defense throughout the trial

06   and petitioner's testimony as to his actions on the night of the incident in question.  (*See id*.,

07   Ex. 20 at 3-35 and Ex. 21 at 2-119.)   Petitioner disputed neither the fact that Seise was injured,

08   nor that he committed a crime.  (*See, e.g., id*., Ex. 20 at 9-10.)   Indeed, petitioner testified,

09   *inter alia*, that he was "extremely aggravated" and hit Seise several times with his fist.  (*Id.*,

10   Ex. 21 at 29, 40, 55-60.)   (*See also id*., Ex. 20 at 18 (counsel argued that petitioner hit Seise

11   "[e]xtremely hard, with his hands only, no weapons."))   He focused his defense on a

12   contention that he committed only second degree assault, maintaining the evidence failed to

13   show either the use of a weapon or the intent to inflict great bodily harm.  (*See, e.g., id*. at 10-

14   27.)

15       Given the evidence and the focus of petitioner's defense, it cannot be said that counsel's

16   failure to object to the testimony of the police officers on direct fell below an objective standard

17   of reasonableness or resulted in prejudice.  As observed by the state court:  "Given the

18   pictures of the blood at the apartment, as well as the pictures of Seise's injuries, defense counsel

19   could legitimately decide that Jones could not credibly dispute that the injuries appeared

20   significant at the time of the police investigation, even based solely on the amount of blood."

21   (*Id.*, Ex. 5 at 6.)   Instead, it can be said that counsel for petitioner reasonably chose not to

22   object based on the position that petitioner had nothing to hide and had admittedly committed a

REPORT AND RECOMMENDATION
PAGE -24

01  crime.   It is also worth noting again, as suggestive of his effectiveness, that counsel succeeded

02  in obtaining an acquittal on the charges of first- and second-degree rape.

03       Nor does the Court find ineffective assistance in the failure to object to the prosecutor's

04  closing remarks.   As discussed above, there is no basis for concluding that, even if considered

05  objectionable, the challenged remarks in the prosecutor's closing statement could be said to

06  have prejudiced petitioner.   Petitioner, accordingly, cannot show that, but for his counsel's

07  failure to object to those remarks, the result of the proceedings would have been different.

08  *Latchison v. Felker*, No. 09-16340, 2010 U.S. App. LEXIS 11320 at *2 (9th Cir. June 13,

09  2010).   Moreover, as stated by the Ninth Circuit:   "Because many lawyers refrain from

10  objecting during opening statement and closing argument, absent egregious misstatements, the

11  failure to object during closing argument and opening statement is within the 'wide range' of

12  permissible professional legal conduct."   *United States v. Necoechea*, 986 F.2d 1273, 1281

13  (9th Cir. 1993) (*citing Strickland*, 466 U.S. at 689).

14       Again, petitioner fails to establish that the state court decisions were contrary to, or an

15  unreasonable application of, federal law, or to otherwise establish that he received

16  constitutionally deficient assistance from his trial counsel.   As such, petitioner's allegation of

17  ineffective assistance of counsel should be denied.

18  C.   Fair Cross-Section

19       Petitioner, in his final ground for relief, takes issue with the state statute delineating the

20  method for assembling the jury pool, RCW 2.36.055.   Petitioner maintains that the statute

21  systematically excludes minority groups and, therefore, denied him a jury venire from a fair

22  cross-section of the community in violation of his Sixth and Fourteenth Amendment rights.

01    However, as argued by respondent, this claim also fails.

02         The Sixth Amendment imposes a fair cross-section venire requirement, meaning the

03    source from which a trial jury is drawn must be fairly representative of the community.

04    *Holland v. Illinois*, 493 U.S. 474, 480 (1990) (*citing Taylor v. Louisiana*, 419 U.S. 522, 527,

05    538 (1975)).   The jury selected need not mirror the composition of the community at large and

06    reflect the distinctive groups within the population.   *Id.* at 483.   A criminal defendant is "'not

07    entitled to a jury of any particular composition.'"   *Id.* (*quoting Taylor*, 419 U.S. at 538).

08    Instead, the Constitution requires that "venires from which juries are drawn must not

09    systematically exclude distinctive groups in the community and thereby fail to be reasonably

10    representative thereof."   *Taylor*, 419 U.S. at 538.

11         In order to establish a *prima facie* violation of the Sixth Amendment's fair cross-section

12    requirement, petitioner must show:

13         (1) that the group alleged to be excluded is a "distinctive" group in the
          community; (2) that the representation of this group in venires from which juries
14        are selected is not fair and reasonable in relation to the number of such persons
          in the community; and (3) that this underrepresentation is due to systematic
15        exclusion of the group in the jury-selection process.

16    *Thomas v. Borg*, 159 F.3d 1147, 1149-50 (9th Cir. 1998) (*quoting Duren v. Missouri*, 439 U.S.

17    357, 367-68 (1979)).   The petitioner must present "proof, typically statistical data, that the jury

18    pool does not adequately represent the distinctive group in relation to the number of such

19    persons in the community[.]"   *United States v. Esquivel*, 88 F.3d 722, 726 (9th Cir. 1996).

20    Upon failure to provide such proof, a fair cross-section claim must be denied.   *Thomas*, 159

21    F.3d at 1150-51; *accord Belmontes v. Brown*, 414 F.3d 1094, 1123-24 (9th Cir. 2005), *rev'd on*

22    *other grounds by Ayers v. Belmontes*, 549 U.S. 7 (2006).

REPORT AND RECOMMENDATION
PAGE -26

01          Petitioner asserts that "African-American, latino, and Asian races were all absent from

02    jury venire."   (Dkt. 38-1 at 5.)   He asserts that RCW 2.36.055 is unconstitutional on its face,

03    pointing to the portion of the statute authorizing counties with more than one superior court

04    facility – such as King County, where petitioner was tried – to divide itself into separate jury

05    assignment areas.   He claims that this county split furthers the chances of underrepresentation

06    of distinct minority groups.   Petitioner also maintains that state law operates to cover up this

07    underrepresentation by destroying the master jury list on a yearly basis and by failing to

08    compile racial information.   (Dkt. 38-1 at 5 (*citing* RCW 2.36.055 and Wash. GR 18(b).)   He

09    asserts that he has tried and failed to obtain data regarding the jury venire utilized in his case,

10    and provides census data to show the racial make-up of King County at the time of his trial.

11    (Dkt. 38-3 at 82-93.)

12          In considering petitioner's fair cross-section claim, the Washington Court of Appeals

13    observed that the Washington Supreme Court upheld, in *State v. Lancellotti*, 165 Wn.2d 661,

14    671, 201 P.3d 323 (2009), the use of RCW 2.36.055 to divide King County into two superior

15    court jury districts.   (Dkt. 14, Ex. 9 at 1-2.)   The court further considered petitioner's claim as

16    follows:

17              Jones also appears to complain about the racial makeup of his jury.
18       Claiming that he is an African-American male and his victim is a Caucasian
         female, Jones argues "the jury should have been 40% minority to be in
         proportion to the County". [Jones asserts that "[h]is jury was 100% white
19       while King County's population hovers around 60% white."]  This argument
         fails as well.

20
21              It is well settled that criminal defendants are entitled to a fair trial before
         twelve unprejudiced and unbiased jurors.  *State v. Davis*, 141 Wn.2d 798, 824,
         10 P.3d 977 (2000).   While "there is some risk of racial prejudice influencing a
22       jury whenever there is a crime involving interracial violence," *Turner v.*

REPORT AND RECOMMENDATION
PAGE -27

01      *Murray*, [476 U.S. 28, 47] (1986), "[t]here is no constitutional presumption of
        juror bias for or against members of any particular racial or ethnic groups."
02      *Rosales-Lopez v. United States*, [451 U.S. 182, 190] (1981).   And, while Jones
        also asserts that all jurors selected were Caucasian, the mere fact no
03      African-Americans were on the jury is not sufficient of itself to establish racial
        prejudice.   *See Davis*, 141 Wn.2d at 837.

04

05              In sum, there is no showing that Jones suffered any prejudice from the
        composition of the jury.   Jones has not carried his burden of showing that there
        has been a systematic exclusion of any racial or ethnic group.   Under the
06      circumstances, there is no showing that Jones' current confinement is unlawful.

07  (*Id.* at 2.)   The Washington Supreme Court likewise rejected petitioner's claim, finding he

08  failed to support his allegation that RCW 2.36.055 resulted in "racially 'disproportionate' jury

09  panels in prosecutions for interracial crimes[,]" and did "not demonstrate the jury in his case

10  was biased or that he was otherwise prejudiced by the jury's composition."   (*Id.*, Ex. 11 at 1-2.)

11          As averred by respondent, the language of RCW 2.36.055 is neutral on its face:

12              The superior court at least annually shall cause a jury source list to be
        compiled from a list of all registered voters and a list of licensed drivers and
13      identicard holders residing in the county.

14              In a county with more than one superior court facility and a separate case
        assignment area for each court facility, the jury source list may be divided into
15      jury assignment areas that consist of registered voters and licensed drivers and
        identicard holders residing in each jury assignment area. Jury assignment area
16      boundaries may be designated and adjusted by the administrative office of the
        courts based on the most current United States census data at the request of the
17      majority of the judges of the superior court when required for the efficient and
        fair administration of justice.

18

19              The superior court upon receipt of the jury source list shall compile a
        master jury list. The master jury list shall be certified by the superior court and
        filed with the county clerk. All previous jury source lists and master jury lists
20      shall be superseded. In the event that, for any reason, a county's jury source list
        is not timely created and available for use at least annually, the most recent
21      previously compiled jury source list for that county shall be used by the courts of
        that county on an emergency basis only for the shortest period of time until a
22      current jury source list is created and available for use.

REPORT AND RECOMMENDATION
PAGE -28

01

02              Upon receipt of amendments to the list of registered voters and licensed
        drivers and identicard holders residing in the county the superior court may
        update the jury source list and master jury list as maintained by the county clerk
03      accordingly.

04  RCW 2.36.055.   Petitioner provides no explanation as to how the use of two jury assignment

05  areas within King County necessarily results in the underrepresentation of minorities.

06              Nor, critically, does petitioner present any proof supporting the alleged systematic

07  exclusion of distinct groups from the jury venire.   "'[A] violation of the fair cross-section

08  requirement cannot be premised upon proof of underrepresentation in a single jury.'"   *United*

09  *States v. Mitchell*, 502 F.3d 931, 950 (9th Cir. 2007) (*quoting United States v. Miller*, 771 F.2d

10  1219, 1228 (9th Cir. 1985)).   Also, census data alone, without any data relating to the jury

11  pool, does not allow for a comparison and, consequently, a determination as to

12  underrepresentation.   *See Thomas*, 159 F.3d at 1150-51 ("We determine absolute disparity by

13  taking the percentage of the group at issue in the total population and subtracting from it the

14  percentage of that group that is represented on the master jury wheel.")   While obstacles

15  clearly exist in the collection of the relevant data, "the reason for [petitioner's] lack of evidence

16  is immaterial."   *Id.* (finding immaterial counsel's failure to preserve statistical evidence and

17  the fact that the statistics no longer existed based on County practice).   Petitioner's failure to

18  provide the requisite proof is fatal to his fair cross-section claim. *Id.*

19              Petitioner fails to establish that the state courts' conclusion as to the failure to show "a

20  systematic exclusion of any racial or ethnic group[]" was contrary to federal law.   (Dkt. 14, Ex.

21  9 at 2.)   The Court, further, based on its own review of the record, concludes that petitioner

22  fails to demonstrate a *prima facie* violation of the Sixth Amendment's fair cross-section

REPORT AND RECOMMENDATION
PAGE -29

01  requirement.   Accordingly, petitioner's final ground for relief should also be denied.

02                                                      V

03           A petitioner seeking post-conviction relief under § 2254 may appeal a district court's

04  dismissal of his federal habeas petition only after obtaining a certificate of appealability (COA)

05  from a district or circuit judge.   A COA may issue only where a petitioner has made "a

06  substantial showing of the denial of a constitutional right."   *See* 28 U.S.C. § 2253(c)(2).   A

07  petitioner satisfies this standard "by demonstrating that jurists of reason could disagree with the

08  district court's resolution of his constitutional claims or that jurists could conclude the issues

09  presented are adequate to deserve encouragement to proceed further."   *Miller-El v. Cockrell*,

10  537 U.S. 322, 327 (2003).   Under this standard, the Court concludes that petitioner is not

11  entitled to a COA with respect to his claims.

12                                                     VI

13           For the reasons discussed above, the Court recommends that petitioner's request for a

14  stay (Dkt. 50) be DENIED and petitioner's habeas petition be DENIED and this case

15  DISMISSED.   An evidentiary hearing is not required as the record conclusively shows that

16  petitioner is not entitled to relief.   A proposed Order accompanies this Report and

17  Recommendation.

18           DATED this 8th day of February, 2011.

19

20                                                                    _____
                                                                      Mary Alice Theiler
21                                                                    United States Magistrate Judge

22

REPORT AND RECOMMENDATION
PAGE -30